**UNITED STATES v. BAECKER et al.**

Equity Nos. 8775, 8780, 8778, 8776; Civil Nos. 3666, 3656, 3843.

District Court, E. D. Michigan, S. D.
March 25, 1944.

White & Case, of New York City, (Thomas Kiernan, of New York City, and Walter J. Blenko, John C. Bane, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., of counsel), for plaintiff.

Abraham L. Bienstock, of New York City, (Don M. Peebles, of Chicago, Ill., and Jesse J. Holland and Sidney O. Friedman, both of New York City, of counsel), for defendant Fansteel Metallurgical Corp.

John C. Lehr, U. S. Atty., and Louis M. Hopping, Asst. U. S. Atty., both of Detroit, Mich., for the United States.

Fred R. Walker, of Detroit, Mich., for defendant.

MOINET, District Judge.

The defendants have contended that the case of Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796, is decisive of this case. I do not so hold.

Some features of the Schneiderman case are applicable, such as the procedural requirements. In the main, however, these cases which were consolidated for trial, and which we called collectively, the Bund cases, present to the Court a quite different situation from that which existed in the Schneiderman case.

The suit to cancel Schneiderman's citizenship was based solely upon illegality and not upon fraud. In the Bund cases the Government charges fraud, and the proofs in support of those charges show that the defendants practiced a fraud upon the naturalization court and upon the United States, by purporting to take a bona fide oath of allegiance to the United States when in truth and fact each secretly retained some measure of allegiance to Germany, and also secretly lacked attachment to American principles, as set forth in the respective findings filed herein.

In the Schneiderman case the Court looked with disfavor upon the imputation of the teachings of an organization to one of its members. The Court recognizes the great force and full applicability of this rule of law. However, these are not the same kind of cases as Schneiderman.

Even so far as the illegality of the procurement of citizenship by Schneiderman is concerned, entirely aside from fraud, the complaint there presented a very slender legal thread, when compared with these cases. The Schneiderman complaint charges that the certificate had been illegally procured in that petitioner was not at the time of his naturalization, and during the five years preceding his naturalization "had not behaved as, a person attached to the principles of the Constitution

of the United States and well disposed to the good order and happiness of the United States, but in truth and in fact during all of said times, respondent * * * was a member of and affiliated with and believed in and supported the principles of certain organizations then known as the Workers (Communist) Party of America and the Young Workers (Communist) League of America, whose principles were opposed to the principles of the Constitution of the United States and advised, advocated and taught the overthrow of the Government, Constitution, and laws of the United States by force and violence."

If the Government failed at any point to prove the chain of facts necessary to sustain that charge it had failed to prove its case. The Court found that Schneiderman's beliefs did not show lack of attachment to the Constitution of the United States. The issue then depended upon whether membership in, affiliation with, or support of the Communist Party organizations amounted to clear, unequivocal and convincing evidence that the naturalization court could not have been satisfied that petitioner was attached to the principles of the Constitution when he was naturalized. It is admitted in the Schneiderman case that the evidence was conflicting as to what the organizations advocated, and the petitioner testified that he did not believe in those teachings of the organizations which were found to be reprehensible and in conflict with the Constitution. In that situation the Supreme Court held that where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a denaturalization proceeding is not justified in canceling a certificate of citizenship by imputing the reprehensible interpretation to a member of the organization in the absence of overt acts indicating that such was his interpretation.

In the Bund cases, there is no conflict of evidence as to the reprehensible character of the organization's program. No one has even attempted to show that there is a permissible interpretation of its program. It is overwhelmingly shown that the German American Bund and its predecessor organizations were formed and carried on for the purpose of aiding Germany. Whatever benefits would accrue to the United States, according to their claim, were secondary and incidental to helping Germany. One can no longer doubt that the program of the Bund was deliberately designed to extend the authority, influence and control of the Nazi German government over German nationals, former German nationals and persons of German descent in the United States. The leaders of the Bund maintained contact with and took directions from high officials of Nazi Germany. Adolf Hitler was looked upon as the personification of their fondest hopes. The Bund assiduously taught the sanctity of the blood ties. They preached the doctrine that naturalization which resulted in expatriation of a German was a mere paper transaction. Assimilation into American ways of thinking was represented to be a corruption of German blood and culture. The idea of denial of political equality to non-German racial groups, as advocated by the Bund, is absolutely opposed to the principles of the Constitution of the United States, as are also other features of the Bund program. The practices in Germany of denial of political rights to racial minorities was applauded by the Bund. The establishment and maintenance of governmental authority upon the leadership principle—Nazi dictatorship—is repugnant to our principles of representative government. Democratic ideas of government of laws and not of men, with constitutional guarantees of individual rights and limitations, checks and balances in powers of government were scoffed at in Bund teachings as being decadent weaknesses. The Bund demanded continuous obeisance of its followers and required a repeated show of loyalty to the German cause in the use of the German language, the raised right hand Nazi-like salute, the display of German flags, the brazen insistence upon display of the swastika, the celebration of German National Socialist holidays and heroes, the distribution of German propaganda, the adoption and use of uniforms patterned after those of German Storm-troopers, the use of German form of organization, the encouragement of frequent visits to Germany and the use of German books and methods to teach American youth. On the other hand, the Bund in its publications and by its speakers acted as a continuous detractor of American newspapers, people, political practices and general culture. Persons of German descent were pictured as victims of organized oppression in America. Germans in other countries were said to be suffering even worse oppression. Germany was upheld as

a helpless nation who by super-human effort and inspired leadership had won the right to unify all German blood-brothers under one strong government. The use of force in international affairs was said to be Germany's only chance of obtaining justice. The members of the Bund were exhorted by official Bund publications to resist compliance with American laws. Bundists were taught to prepare themselves for speedy, organized action under Bund leadership and authority in the event of future widespread disorder in America.

Considering the overwhelming evidence produced to show that the Bund program was of the un-American, subversive character indicated above, it is understandable that no one has arisen to say that the program of the German-American Bund was anything but reprehensible. It follows, therefore, that the logical difficulties encountered by the Court in the Schneiderman case, are not presented to the Court in this case.

There are additional distinctions between the cases, which have been urged by the Government here, and some of them are also substantial. For example, in the Bund cases, in addition to evidence of membership and activity in the organizations, there is evidence of statements and conduct on the part of the individual defendants which shows that they believed and acted in accordance with the Bund program and in some instances, independent of the organizations, the defendants spoke and acted in ways inconsistent with unqualified allegiance to the United States and attachment to its principles.

Accordingly, the orders admitting the defendants to citizenship are respectively set aside and canceled.

MOINET, District Judge.

It seems to me that the Findings of Fact, with respect to the activities of the German-American Bund and its predecessor organizations, are necessary to an understanding of the decision of the Court with respect to each of these defendants.

In re BAECKER

Findings of Fact.

1. The defendant herein entered the United States as an immigrant in October of 1928.

2. Prior to September 9, 1935, the defendant was a native and citizen of Germany.

3. On May 9, 1935, defendant herein filed a petition for citizenship No. 92351 in the United States District Court, Detroit, Michigan, in which he alleged under oath as follows:

"I am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of (whom, which) at this time I am a subject (citizen) and it is my intention to reside permanently in the United States."

4. On September 9, 1935, this court entered an order admitting the defendant to citizenship, and the Clerk issued Certificate No. 3915633 on the same date the defendant took the following oath of allegiance:

"I hereby declare, on oath that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of (whom, which) I have heretofore been a subject (citizen); that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely, without any mental reservation or purpose of evasion; so help me God. In acknowledgment whereof I have hereunto affixed my signature."

Although Baecker and his family resided in the United States since 1928, none of the family have, with the exception of the defendant, voluntarily obtained United States citizenship. His wife and his children, with the exception of those who were derivative citizens, made no effort to apply for citizenship until recently.

Baecker had a father and mother residing in Germany until their deaths in 1940. In addition he has a brother, sister and other relatives, including a cousin Willy Van den Bruck in Germany. The defendant has two brothers living in the United States.

5. The defendant herein was a member of the German-American Bund and its predecessor organization, The Friends of New Germany, from 1933 until 1939.

6. The defendant held the position of contact man in the German-American Bund from 1936 until September 24, 1938. The position of contact man was that of representative of the Bund to other German organizations in the City of Detroit.

7. The uncontradicted testimony of Scott and Neumann, who were former Bund members, is that the defendant herein attended closed officers' meetings of the Friends of New Germany and the German-American Bund from 1933 until 1938 at which meetings policies and programs of the Bund were discussed.

8. In May, 1935, the defendant herein attended a Regional Convention for the Middle West District of the Friends of New Germany in Detroit. A program, called Deutsche Tag, was issued in connection with this convention which contained a clear exposition of the purposes and aims of the Friends of New Germany, its adoption and belief in the principles of National Socialism and its loyalty and allegiance to the New Germany as represented by Adolf Hitler and the Nazi Party. This program also contained a facsimile reproduction of a dedication by Adolf Hitler on a copy of Mein Kampf which Adolf Hitler had personally sent to the Chicago Teutonia in 1924. This program was found in the defendant's possession in 1941, and he admits that he had attended this convention and received this program. Anyone who read this program would have no doubt of the true aims and purposes of the Bund which was then known as the Friends of New Germany.

9. There was also found in the defendant's possession a copy of the Yearbook of the German-American Bund for 1937. From the excerpts from this book read to the court, there can be no doubt that the Bund stood for National Socialism and Germany. There was also found in defendant's possession Bund paraphernalia such as membership applications, a program of Bund celebration held on July 4, 1938, and a notice of a meeting.

10. Defendant claims that as far as he knew, the Bund was a social organization, but the evidence clearly and convincingly discloses to this court that the defendant was fully aware of the true aims and purposes of the German-American Bund and its predecessor organization. The defendant admitted under questioning that National Socialism was one of the main topics of discussion in the Bund. He admitted that the Horst Wessel Song and the Deutschland Lied were sung as a regular part of the meetings. He admitted that the swastika flag was prominently displayed and that he participated in giving the Nazi salute of the raised right hand at the close of meetings, together with the oral salute of "Sieg" or "Sieg Heil". Defendant claims that he resigned from the German-American Bund because it was too radical and that they emphasized National Socialism too much, and yet, in earlier portions of his testimony defendant claims that he did not know what the Bund stood for. The court finds that the defendant was well aware during his entire membership in the German-American Bund that it stood for a system of government diametrically opposed to the system of government in the United States. The defendant's claim that he resigned from the Bund because it stood too strong for Germany cannot be maintained because the uncontradicted evidence disclosed to this court that within a few months after his alleged resignation he began a recruiting program to furnish Germany with workers which it needed to build up its industrial and war factories. Within two months before the time that Germany launched its invasion of Poland this defendant who had been a skilled munitions worker in the Krupp Plant in Germany, and who still maintained correspondence with friends and relatives close to that plant in Germany, received word by letter from his son August in Germany that Herman Goering, Reich Marshal of Germany, said Germany needed 3,000 more workers from America in the Fall.

11. The uncontradicted testimony of the witnesses produced by the government on the activities of the National Bund disclosed that the Bund was connected with the recruiting of workmen to return to Germany. The testimony of Kapfer and Weiler showed that they filed their applications with Baecker for return to Germany and the applications were made at a Bund meeting in 1939. The court finds that Baecker was a member of the Bund at least until the middle of 1939. In any event, the court finds that the defendant's recruiting program was a continuation of his efforts on behalf of Germany and National Socialism which had commenced with his joining the Bund Friends of New Germany. His testimony on the witness stand that he resigned from the Bund because it was too radical is completely rebutted by the letter of resignation as contact man in which he states: "It has always been a pleasure for me to work with you as well as with all of the comrades." Signed "With German greetings". This letter clearly demonstrates to the court that the defendant was on the best of terms with the then leader and with all the comrades and enjoyed doing the work of the Bund, which consisted in voicing and spreading the theories of National Socialism and allegiance to the New Germany. It is significant to note at this point that the defendant signed the letter, "Mit deutschem Gruss." A witness on behalf of the government, Joseph Morgan Roland, who qualified as an expert on National Socialism, testified that this greeting in National Socialist philosophy had the same meaning as "Heil Hitler." It is exceedingly significant to this court that a person who claimed to be an American citizen and practiced American ways should use a greeting which was peculiarly a symbol of Nazi Germany.

12. The court finds that the defendant never intended to reside permanently in the United States, and at all times intended to establish at a future date a permanent residence in Germany.

(1) Significant in this regard is the maintenance by the defendant of his old age pension which he had started in Germany in 1902.

(2) In 1937 Baecker prepared for his eventual return to Germany for permanent residence by purchasing $3,500 of Rueckwanderer marks which represented all the money he owned. I find as a fact that

Baecker was aware of the German law which prescribed that Rueckwanderer marks could only be used in Germany by those who intended to return to Germany for permanent residence. I find as a fact that the defendant, when he executed his application for Rueckwanderer marks, stated that he intended to return to Germany for permanent residence. In furtherance thereof, I find that the defendant obtained a certificate of acceptability on the part of the German government to the defendant's reimmigration to Germany.

(3) I find that the defendant in furtherance of his plan to return to Germany for permanent residence, purchased a building containing six flats and business space from which he would derive an income to support himself in Germany, and since he did not pay the complete purchase price, he gave a mortgage for the balance. The fact that the defendant did not remain in Germany for permanent residence in 1937 is explained by himself that he knew that under the German laws a mortgagor could not take up permanent residence in Germany until three years from the date of the giving of the mortgage, which three-year period would expire July 1, 1940.

Baecker admits that when he returned to the United States in 1937, he initiated efforts by correspondence with his cousin, Willy Van den Bruck, who was Baecker's agent in Germany, to obtain from the German authorities special permission to return to Germany before the three-year period had expired. Van den Bruck, on Baecker's request, did attempt to obtain this special permission from the German government, and he advised Baecker that he could obtain such special permission for him to return to Germany by obtaining certificates from the N.S.D.A.P. and the German Foreign Organization showing that it was upon their request that he had changed his scheduled return to Germany. Van den Bruck further advised Baecker in this connection that this should not be difficult for Baecker to do in view of the document which Baecker had had in his possession and had shown to Van den Bruck at the time Baecker was in Germany in 1937.

(4) Baecker testified that he had been advised by his parents in 1932 that they expected him as the oldest son to take the parental estate in Germany, valued at 15,000 marks in 1937, and make provision for the other heirs in Germany or elsewhere. The proceeds of this estate likewise could not be used outside of Germany. If the defendant continued to reside permanently in the United States, it was unnecessary for him at any time to take his money to Germany to take over the parental estate and provide for the other heirs.

(5) The defendant on the witness stand repeatedly denied that he had corresponded with various people in Germany and on other occasions where the proof was almost irrebut-table, he testified that he could not remember any correspondence. I find as a fact that the letters received by Baecker from Germany and saved by him clearly and convincingly show that he carried on continuous correspondence with those persons relative to the matters mentioned in the letters.

(6) The correspondence from friends and relatives in Germany to Baecker in Detroit show clearly that those persons in Germany were expecting the return of Baecker and his family to take up residence in Germany and that they had received the information upon which they based this expectation by correspondence from Baecker and his family. Even correspondence from defendant's children, Anne and Augie, while in Europe in 1939, indicated that they expected the family to return to Germany. Correspondence further shows that Baecker had considered the place in Germany where he was to reside. He had formerly lived in Essen, and had worked in the Krupp Munitions Factory there. The correspondence shows that he was considering to resume residence in Essen unless conditions upon his arrival in Germany would make it more advantageous to him to take up residence in another industrial city in Germany.

13. Beginning in 1938 Baecker had close connections with high officials from Germany who were launching the Volkswagen Works and had discussed with Dr. Dyckhoff, the head of Volkswagen Works, the opportunities which that industry would afford for skilled workmen in Germany. Baecker had assisted in obtaining employment in the Volkswagen Works in 1938 and 1939 for approximately sixty workmen from Detroit, Michigan, including his son, August, Jr. The correspondence between Baecker and his son, August, Jr., shows that his son was aware that his father was not acting in conformity with the United States law in recruiting these workmen when the son deliberately lied to the American Consul in Stuttgart about his connection with his father's activities, stating to the Consul that he had come from Flint, Michigan. Baecker himself testified that the reason his son must have lied to the Consul was because he was afraid of getting his father into trouble.

14. Baecker subscribed in 1938 to a magazine, "Joy and Work," published in Germany, which was the magazine of the Arbeits Front, the official German government labor union.

15. While the defendant denied that he had knowledge of the National Socialist government in Germany, the court finds that from his numerous contacts with officials of that government, and membership in the Friends of New Germany and German American Bund, he did have knowledge of its organization and operations.

16. The court observes from the defendant's demeanor on the witness stand, his attitude, his hesitancy in answering questions, his failure to give direct answers to questions

propounded by the government and alleged lapses of memory, that the defendant has not fully and truthfully replied to the questions asked of him by the government attorney.

17. Baecker maintained an inactive bank account in his personal bank in Essen, Germany, throughout the time that he was in the United States, and resumed active banking connections in 1937 to the point where he had at least four bank accounts which he was using for his current purposes in Germany, both business and personal.

18. In 1937 Baecker had calling cards printed for his use in Germany, and on this card he represented the address of his former home as his residence in Germany, which he said was in accordance with the German custom.

19. On October 24, 1941, an indictment was filed in this court charging the defendant herein with having acted as an agent of a foreign power, to-wit, Germany, without having been duly registered as such with the State Department of the United States, and defendant later pleaded guilty to this charge although the defendant claims now that he did not know he was doing wrong or acting for the German government at the time when he actually committed the acts. This is rebutted by the uncontradicted testimony of William Scott, who testified that in 1938 Baecker told Scott, "If the authorities knew what I was doing, I would go to jail." His present beliefs are also rebutted by his daughter, who wrote, "Father worked so hard for Germany in America, and his son gets nothing for it," in complaining about the lack of recognition given to Baecker's son in Germany. This is also borne out by Baecker's resignation as an officer of the Bund wherein he stated, "I definitely feel I have done my best for Germandom." The defendant even now admits that he had some doubt as to the legality of his activities in recruiting skilled labor to go to Germany since he testified that he asked Hagemeister, who was also engaged in this recruiting work, whether or not it was legal, and, furthermore, consulted an attorney in Detroit about it, who told him that it would be illegal. He further testified that he at no time took this matter up with competent officials of the United States government to determine whether or not his actions were legal.

20. In 1938 Baecker made several contacts with a Mrs. Theresa Behrens who was then connected with the YWCA International Center in Detroit, Michigan, as a result of which she referred to Baecker prospective reimmigrants to Germany for assistance in obtaining jobs in Germany. Only German workers were acceptable. While some records were found in the International Center of these interviews, no corresponding records were found in the possession of Baecker. The circumstances strongly indicate that this was a secret arrangement. Mrs. Behrens has subsequently been convicted upon her plea of guilty of the offense of conspiracy with seven other persons to commit espionage in violation of the laws of the United States to send information of value to the German government.

21. On June 30, 1934, Baecker obtained a German passport which was valid until June 30, 1939, and was in his possession until he was arrested by Federal Bureau of Investigation agents on August 11, 1941.

22. On February 27, 1937, Baecker obtained a United States passport which was valid until February 27, 1939.

23. In 1937 and 1938 Baecker contributed money to the German winter hilfswerk, which money was to be sent to Germany through the German Consul.

24. In 1941 Baecker made a $10.00 contribution to Kyffhauser Winter Hilfswerk Fund, the proceeds of which were sent to the German government.

25. On August 11, 1941, August Baecker had in his possession lists bearing the names of German war prisoners in nine different prison camps in the Dominion of Canada which he admits he had obtained from the restaurant of Max Stephan, the convicted traitor.

26. Baecker stated that he made no records whatever of his transactions in assisting the return to Germany of numerous workmen sent from the Detroit area. Correspondence and records which came to him as the result of such transactions were not found in his possession on August 11, 1941, although he admitted that he had received replies from the New York office after submitting the names of such men to the German agents there.

27. In the spring of 1939 William Kayser, a tool and die maker of German descent who had been employed for many years at the Dodge Motor Company in Detroit, received a letter from August Baecker, in response to which he went to see Baecker at the German-American Bund meeting place in Max Stephan's Restaurant. At this time Baecker asked Kayser if he were interested in returning to Germany to work. Upon being advised by Kayser that he was not interested in returning to Germany at all, but that he would like to know how Baecker got his name and address, Baecker recovered the letter from Kayser which Baecker had written, and at the same time Baecker told Kayser that he had obtained his name and address from Germany.

28. Baecker had in his possession at the time of his arrest a quantity of isolationist literature.

29. Baecker attended a lecture by an isolationist speaker at an America First Rally held at Cass Technical High School, Detroit, Michigan, in 1940 or 1941.

30. Baecker made a visit to Germany in the summer of 1932 and again in 1937.

31. Baecker was very much interested in having his son, August, Jr., prepare himself for an engineering career by working in Ger-

man industries, and it was for this reason that August, Jr. went to Germany in the summer of 1939. August, Jr., had been attending school in the Ford Motor Company Apprentice School for tool and die makers, as well as working in the Ford Motor Company at Dearborn, Michigan, up to June, 1939.

32. Baecker admitted that the outbreak of the war in Europe in September, 1939, disrupted his plans.

33. The court finds that the defendant's membership in the German-American Bund and its predecessor organization, The Friends of New Germany, immediately prior to his naturalization is convincing proof that the defendant was not attached to the principles of the Constitution of the United States, nor that he was well disposed to the good order and happiness of the United States. His continued membership and activity in the Bund after his naturalization can lead only to the conclusion, that the defendant at no time intended to become a citizen of the United States, but intended to retain his allegiance to Germany. This was further borne out by his admitted activities on behalf of the German government and efforts to develop German industry by the recruiting of workers to return to Germany.

34. The Court finds that defendant Baecker became a member of the Friends of New Germany, Detroit Group, in 1933, and continued as a member of the successor organization, German-American Bund, until 1939. That although defendant claims he was a Bund member from 1934 to 1938, the testimony of his fellow defendants and other Bund members clearly shows that defendant was a member from at least 1933 until 1939. Paul Gies, who was leader during 1933 and January, 1934, testified that Baecker was a member while he was leader. Baecker made much of an alleged resignation from the Bund dated September 24, 1938; yet, the testimony of the then leader of the Detroit Unit, John H. B. Schreiber, the recipient of the letter, shows that this was accepted by him merely as a resignation as contact man. Louis Jaenichen, Jr., on whose farm the Bund maintained a camp and held meetings, testified that when the Bund built its pavilion in the summer of 1939, Baecker was one of those who helped to construct it. It was testified by several other Bund members that the pavilion was built in 1939. Baecker also admitted that members of his family attended Bund affairs after September 24, 1938. Weiler and Kapfer testified that they attended Bund meetings in 1939 in connection with their efforts to return to Germany through Baecker and met Baecker at those Bund meetings which were held in Max Stephan's Restaurant. Further letters in evidence from son Auggie written in Germany on the day after July 4, 1939, inquires of the Baecker family as to their attending the camp on July 4, 1939.

35. The court finds upon a consideration of all the evidence that the testimony of the defendant could not be relied upon with respect to several points in issue.

36. The court finds from a consideration of all the evidence that Defendant was for several years attached to and supported the National Socialism theories, known as the Blood Theory, the Volk Theory, the concept of the "Ein Volk, Ein Reich, Ein Fuhrer", and the leadership principle—all as advocated by the German-American Bund. The defendant identified himself with the German Volkdom.

37. The court finds that defendant Baecker came to the United States in 1928 and brought his wife and five children here in order to make a better living and to enable his children to become educated in this country. As soon as the youngest child finished high school, the evidence shows that the plans of Baecker to return to Germany began to appear, as indicated by his trip to Germany in 1937 and the purchase of Rueckwanderer marks.

### Conclusions of Law.

1. The defendant at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. An order should be entered setting aside the original order admitting the defendant to citizenship and cancelling his certificate of citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building, in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and crossexamined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said. complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud.

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said August Baecker to citizenship, upon petition number 92351, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,915,633 heretofore issued to August Baecker be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

## In re EBERT

### FINDINGS OF FACT

1. Fritz Bruno Ebert was born in Zwickau, Saxony, Germany August 5, 1882. He migrated to the United States in June 14, 1923 and has resided in the United States since that time.

2. Defendant Ebert made and filed his petition for naturalization in the U. S. District Court at Detroit, Michigan on April 24, 1929 in which he represented as follows:

"I am attached to the principles of the Constitution of the United States, and it is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the German Reich of whom at this time I am a subject, and it is. my intention to reside permanently in the United States."

3. He was thereafter admitted to citizenship of the United States by an order of the court based upon his petition No. 41941 on July 29, 1929. On the same day defendant took an oath of allegiance to the United States as follows:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the German Reich of whom I have heretofore been a subject; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; and that I will bear true faith and allegiance to the same."

4. The representations made by the defendant in his petition for naturalization were false.

5. His oath of allegiance was false.

6. Defendant at the time he took his petition for naturalization lacked an intention to reside permanently in the United States; he further lacked attachment to the principles of the Constitution of The United States; he did not renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to Germany of which he at that time was a citizen or subject.

7. Prior to the 29th day of July, 1929 defendant Ebert was a native and citizen of Germany.

8. At the time of taking his oath of allegiance, defendant Ebert did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to Germany of which he had theretofore been a citizen or subject; he did not have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; he did not have the will to bear true faith and allegiance to the same. He did have a mental reservation of allegiance to Germany; he did have a secret purpose to evade his obligations as a citizen of the United States and to serve the cause of his native country Germany.

9. Defendant resided in Germany from the time of his birth until 1923 following the oc-

cupation of clerk in a candy manufacturing company. He served in the German Army during the first world war from 1915 to 1920 having the rank of a corporal at the time of his discharge. He was a member of the Kyffhaeuser in 1923, an organization of German Army Veterans of the first world war. During his residence in Germany he was a member of the German Clerks' Union Verband Deutscher Handlungsgehilfen. In 1923 defendant was one of the twelve co-founders of the Detroit Unit of the Stahlhelm which was a German War Veterans' Organization in the United States. He is not shown to have been in disagreement at any time with the purposes of the Stahlhelm, but was excluded because he critisized one, Ziegler, for the manner in which he replaced Karl Leonhardt as President.

10. Defendant has a brother-in-law named Wilhelm Grimm who is an official of the Nazi party and with whom the defendant corresponded. During part of the time that the defendant corresponded with William Grimm the latter was stationed in Helsingfors, Finland as a representative of the Nazi party for the German Government, or both. The defendant also has a friend named Hans Stephan whom he describes as his closest friend since boyhood who lived in Zwickau, Germany, and from whom defendant received information concerning the activities of the Nazi party in Germany.

11. Defendant has been employed in the United States for many years as an attendant in the Power House of the Ford Motor Company.

12. Defendant was divorced from his former wife in 1930 and since that time has lived as a single roomer in one rooming house and another. He has few personal friends or visitors who have had intimate contact with him in Detroit, Michigan.

13. Defendant claims to be a stamp collector and, as such, has written many letters to persons whom he describes as friends interested in his stamp collecting, some of whom were in Germany and other European countries, also in South America. By means of this correspondence messages concerning matters other than stamp collecting have been transmitted between the defendant and persons in Germany, sometimes through an intermediary in South America or a third country.

14. Defendant is not a photographer and does not show any inclinations toward photography, but has on occasion collected photographs of installations in the Plant of the Ford Motor Company, some of which he admittedly sent to his friends in Germany.

15. Defendant had in his possession many German medals. Several of these medals were awarded to him for his service in the German Army. A large number of the medals were issued by officials of the Nazi Government and party in Germany for various services to the party and for honors bestowed by the party upon individuals for noteworthy adherence to their cause, all of which were prominently decorated with the swastika symbol of Nazi, Germany.

16. Defendant sent information to Germany through his personal friends and correspondents which was important to Germany and which was said by those correspondents in Germany to have been transmitted by them to high Nazi officials in Germany. He had been informed that Germany wanted to know what was going on in the United States.

17. The defendant habitually wore a swastika design on his watchcharm. He also displayed swastika pennants on the fenders of his automobile. He kept swastika flags on the wall in the room in which he lived.

18. While the defendant admitted having written to Germany and sending information and having received Nazi medals from Germany, he claimed that the medals bearing swastika designs were sent to him merely to satisfy his curiosity as to what the Nazi party was doing in his old home town in Germany. There is no indication, however, that the defendant maintained any general collection of medals nor that he had in his possession any medals or souvenirs evidencing an interest in American institutions, customs, life or progress.

19. The defendant falsified in his testimony upon the stand concerning his possession of American flags in the room in which he lived. It was apparent to the court that the defendant was making a clumsy effort to impress this court with some attachment to the United States whereas, upon all of the evidence in this case, it is most convincingly apparent to the court that the defendant had a deep and abiding interest in Germany to the exclusion of matters in the United States.

20. The defendant requested and received large amounts of pro-Nazi propaganda entitled "Bundles from Britain," some of which bore photographs of American soldier dead of the first world war. Ebert's purpose in obtaining those was to aid Germany by keeping America out of the war.

21. Defendant received German propaganda from Germany, from the Fichte Bund and from his personal friends in Germany. The Fichte Bund is an official German propaganda agency with headquarters in Hamburg, Germany.

22. Defendant received much printed matter explaining and propagandizing in favor of the principles of German national socialism.

23. Defendant was requested by an official of the Nazi party to supply certain particular information from the United States about the attitude in the United States toward the Nazi program and the defendant complied with this request by furnishing him information.

24. Defendant sent information to two of his personal friends in Germany with knowledge that officials in Germany desired to obtain such information from the United States. It is significant to the court, in view of the quantities of printed matter, medals, insignia, etc. that defendant collected, that there is nothing in the evidence indicating that the defendant was interested in the principles of American Government. He had nothing in his possession indicating a patriotic American attitude.

25. In 1939, while the German army was fighting in Poland, defendant stated to a witness that Poland was "getting what they deserved because too aggressive". He stated "anyone could see that they were suffering from some kind of neglomania, jumping on Germany." He also stated that "one German is worth ten Poles."

The defendant justified the action of Germany against Poland and said he believed that Poland would become better under German rule. The defendant had a picture of Hitler on the wall of the room in which he lived. He also had small swastika ornaments around the room. In conversation with one witness, defendant spoke about having the courage of his convictions. He was speaking at the time in favor of the principles of Hitler and the National Socialist Regime in Germany. The defendant told one witness that, although this country had been very good to him, he still believed that he would go back to Germany and that everything in Germany would be better than it had been before. On one occasion defendant described Adolf Hitler as a genius and a superman. On an occasion in 1940 Ebert stated that Germany would win the war; that the United States would not intervene, and that even if it did it was too late to change the situation in Europe. Ebert justified the program of Hitler, including his actions against the Jews, depriving them of life, liberty and property. He stated that was the only way Hitler could get rid of the Jews and that was to kill them. In about 1937 Ebert condemned the Versailles Treaty as being unjust to Germany and stated that Germany had a right to re-arm, also that Germany had a right to take other countries of Europe, such as Czechoslovakia and Austria because there were in those countries people who spoke the German language and who were of German origin. He also believed that Germany was justified in drawing in skilled laborers "because Germany would need them in the coming war." Ebert also believed that Germany was entitled to acquire colonies in order to get raw materials and to provide living space for her people.

26. The testimony of the witnesses as to statements made by the defendant Ebert were entirely undenied and uncontradicted by any evidence.

27. Among the fellow members of the Stahlhelm in Detroit, which was a German Nationalistic Organization, were some who were closely associated with Paul Gies, and defendant Ebert Karl Leonhardt was associated with Gies and Ebert both in the Stahlhelm and in the Friends of the New Germany Organization. Leonhardt had subsequently been convicted of conspiracy and to commit espionage against the United States by attempting to send information of value to Germany.

28. The evidence disclosed that between 1931 and 1933 the defendant participated in the meetings of the Nazi Party Unit in Detroit which met at a house which was known to the defendant as the "Hitlerheim." The evidence is uncontradicted that the Nazi program was discussed and espoused. Nazi Party members such as Walter Hentschel, Hans Strauss and Heinz Spanknoebel who were in direct communication with the Nazi Party in Berlin, directed their meetings. The defendant does not admit membership, but admitted knowledge that there was a unit of the Nazi Party and that he believed Hentschel, Strauss and Spanknoebel were Nazi Party members. He admits attendance at these meetings.

29. Knowing that the Friends of New Germany was the successor organization of the Nazi party in Detroit, the defendant admits and the testimony of witnesses definitely shows that defendant became a member of the Friends of New Germany and continued as an active member until at least August, 1934. Further, the testimony shows that he continued to attend meetings and celebrations of the Bund as late as 1939. In his statement to the F. B. I. on February 19, 1943 he gave as his reason for leaving the Bund was because of the manner in which the organization funds were handled and not because of any disagreement with the Nazi policies of the Bund. The defendant's interest in the Bund was not transitory. As in 1937 he corresponded with people in Germany concerning the Bund and its Fuehrer because he believed the Nazi Party should act as to the manner in which Fritz Kuhn, the Bundesfuehrer was behaving in his personal life. From defendant's statements to agents of the F.B.I., from the literature found in his home, from his admission on the witness stand and from his evasive, hesitating and uncooperative attitude on the witness stand in regard to the Nazi Policies and the Bund, it is apparent to this court that the defendant had a clear knowledge of the Nazi philosophy and program and its extension into the United States through the Bund organizations.

At the time of the defendant's alleged withdrawal from the Bund he did not lose any interest in German nationalist organizations. In 1934 defendant joined the Deutsch Nationaler Handlungsgehelfenverland, an extension in

the United States of the clerks' union to which he had formerly belonged in Germany. He belonged to their organization until 1936.

30. In 1937 the defendant joined the Deutsch-Amerikanische Berufsgemeinschaft knowing that such organization was affiliated with the Arbeits Front of the Nazi Party, and knowing that dues he paid to such organization would be credited to him in the Arbeits Front in Germany, the defendant continued to pay dues to such organization until June, 1939 and received the propaganda of such organization until June, 1939.

31. The defendant's interest in Germany is further shown by his correspondence with friends in Germany in which he gave information concerning public opinion in the United States concerning National Socialism, knowing the same would be communicated to high officials of the Nazi Party for the Nazi Party's use.

32. The defendant's further personal regard for Adolph Hitler was so strong that he personally communicated with Von Papen, the notorious Nazi diplomat, concerning the Fuehrer's health. Defendant went so far as to attempt arrangements to have a Detroit doctor, described as a "pure aryan," to go to Germany to save Adolph Hitler. In correspondence with friends, the defendant was commended for his efforts on behalf of Germany. Even his friends with whom he had correspondence and whom he still calls his best friends state "because you always believe in our great Fuehrer even beyond the ocean and call him a 'fighter for the old cause'."

33. In the correspondence received by defendant in answer to defendant's letter and his membership in the Deutsch-Amerikanishe Berufsgemeinschaft which the defendant knew would provide him with social and financial protection only in Germany, this court finds convincing evidence that defendant intended to return to Germany for permanent residence shortly before the outbreak of war in Germany.

34. In statements given to agents of the F.B.I. in 1943 the defendant approved of Hitler's program of conquest throughout, his National Socialist Program, his disregard of the Versailles treaty and desired a German victory over England. He was against Lend Lease in 1941 because he did not wish to see Germany defeated. Defendant admits in his statement to agents of the F.B.I. that his opinions as given in statement to the F.B.I. in 1943 have been his opinion since about 1920. This court concludes that these were his opinions at the time he took the oath of allegiance to the United States in 1929 and under such circumstances this oath could not have been honestly and truthfully taken since he did not absolutely and entirely renounce allegiance to Germany and that he did not intend to support and defend the Constitution

of the United States against all enemies. This is strongly supported by defendant's statement to agents of the F.B.I. on June 10, 1943, one and one half years after war was declared between the United States and Germany—"due to my training in Germany and my training in the United States I have a conflict of interests which mixes up my mind as to my opinion in the present war and I would like to have no opinion about the war at present."

## CONCLUSIONS OF LAW

In addition to the conclusions of law heretofore reached and announced in connection with the findings about the Bund in this cause, the court reaches the following conclusions of law:

1. The defendant, at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen, and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation in that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation in that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation

in that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. Let an order be entered setting aside the original order admitting the defendant to citizenship and cancelling his Certificate of Citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and cross-examined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud.

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said Fritz Bruno Ebert to citizenship, upon petition number 41941, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,124,304, heretofore issued to Fritz Bruno Ebert, be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

## In re GUENTHER

### FINDINGS OF FACT

1. Defendant Guenther was born near Kassel, Germany, on August 15, 1894, and immigrated to the United States in July, 1923.

2. Guenther resided in the United States from July, 1923 until 1939 except for trips to Germany in 1935 and again in 1939.

3. Guenther filed a petition for naturalization in the United States District Court for the Eastern District of Michigan on September 24, 1929, representing under oath as required by law as follows:

"I am attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States. It is my intention to become a citizen of the United States and renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which at this time I am subject, and it is my intention to reside permanently in the United States."

4. Upon his petition for naturalization an order was entered in the United States District Court for the Eastern District of Michigan on December 30, 1929, admitting the defendant to United States citizenship. On the same day defendant Guenther took the following oath of allegiance in open Court:

"I hereby declare on oath that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which I have heretofore been subject, and I will support and defend the constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion; So Help Me God. In acknowledgment whereof I have hereunto affixed my signature."

5. Prior to December 30, 1929 defendant Guenther was a native and citizen of Germany.

6. Defendant was married in Germany to a native of Germany, who has at all times remained a citizen of the German Reich. He has had a son, Rolf Heinz, and a daughter Katherine, both of whom were born in Germany. He has a brother presently residing in Stuttgart, Germany, as well as other family connections of himself and his wife, also residing in Germany at the present time. He has no relations in the United States.

7. Defendant came to the United States through the assistance of a friend and fellow musician, who had preceded him to this country, because economic conditions in Germany at that time were unfavorable for a musician. His wife and daughter followed him to the United States some months later. His son Rolf remained in Germany to finish his elementary education there, being at the same time very ambitious for a German career as a Professor of Languages.

8. Defendant followed his profession as a musician in the United States, first in Toledo, Ohio, and later in a theatre in Detroit, Michigan; and for a number of years he has been a cellist in the Detroit Symphony Orchestra.

9. Several of defendant Guenther's fellow-musicians, with whom he has played in the Symphony Orchestra and elsewhere testified

to Guenther's extremely pro-Nazi statements and attitudes.

10. Defendant Guenther was in charge of a German hour on Radio Station WJBK, Detroit, Michigan, for approximately one year. He was discharged by the Manager of this radio station when Guenther let it be known that he wanted a week-end off to practice marksmanship with a gathering of German-American Bund members at a Bund Camp north of Detroit, Michigan.

11. Guenther used the German language in his home even when visitors were present who spoke no German. A large framed photograph of Adolf Hitler was displayed on the Guenther living-room wall over the radio opposite the front door. In the dining-room, on the wall over the buffet, a swastika flag was displayed.

12. Guests in the Guenther's home were sometimes greeted in German with "Sieg Heil" and with a Nazi right arm salute. German songs were sung on occasions.

13. Mrs. Guenther, wife of the defendant on occasions held Kaffee Klatches for groups of German ladies.

14. At mixed parties of friends in the Guenther home the defendant and his wife and son strenuously advocated German National Socialism and approval of the policies of Hitler.

15. The Guenther family had a large watch-dog in their home who wore a blanket decorated with swastika emblems and responded to commands only in the German language.

16. Guenther regularly listened to German short wave radio broadcasts from Germany, and urged others to do so at his home, in order that they could get the truth, which he claimed could not be obtained except from Germany. He did not believe the American newspapers.

17. Defendant Guenther believed that Germany was the source of all worth-while culture according to the testimony of witnesses who heard Guenther so express himself on many occasions.

18. The wife of defendant Guenther who was a dress-maker made about 500 swastika arm bands for the German-American Bund. Guenther cashed the checks for these arm bands, but said that his wife used the money from them.

19. On one occasion neighbors of the defendant Guenther observed two men leave the Guenther apartment at about dusk and drive away hurriedly in an automobile which had come through the adjoining alley. These two men wore uniforms which a witness definitely testified were not American uniforms nor like any uniforms with which the witness was familiar. On the sleeves of the uniforms worn by these two men were designs very similar to arm bands.

20. The daughter of Herman Guenther boasted to a neighbor that she had successfully escorted Fritz Kuhn, National Leader of the German-American Bund from the Guenther home to a railroad station at a time when Kuhn was sought by authorities.

21. On occasion when defendant Guenther listened to German short-wave radio broadcasts he demanded complete silence from all persons present. His customary practice was to pull a chair close to the radio and place his ear directly in front of the loud speaker and listen to the broadcast with fullest attention.

22. Defendant Guenther on frequent occasions expressed Anti-Semitic feelings and spoke favorably of the Nazi treatment of the Jewish problem in Germany.

23. Defendant Guenther made a recording of his voice to send a message to his wife in Germany and closed this message with "Heil Hitler". He also used this same closing expression on a Christmas card sent by him to a former fellow employee at Radio Station WJBK.

24. Defendant Guenther in an effort to controvert the testimony that he had Anti-Semitic beliefs testified that his daughter Katherine kept company with a certain Mr. Levy who was Jewish and that this gentleman was her only "boy friend". On the other hand the Government called as a witness a young man by the name of Paisley who had steadily kept company with the daughter of the defendant for several years, calling on her at her home on frequent occasions; Paisley was not Jewish and has not claimed to be. Defendant Guenther knew this young man and knew that he lived on the next street to Guenther's home and that Paisley's property abutted that of the Guenther home directly across an alley. Guenther produced no explanation for this discrepancy in his sworn testimony.

25. Among the defendant Guenther's close personal friends were several persons who were enthusiastic advocates of German National Socialism. On the other hand some of the friends of defendant Guenther who had known him since his residence in Germany and who were not believers in German National Socialism did not break off friendship with the defendant Guenther, but had an understanding with the defendant that the subject of National Socialism would not be discussed so as to avoid unpleasant dispute between otherwise good friends.

26. Defendant Guenther expressed himself, as being dissatisfied with his situation in the Detroit Symphony Orchestra. He disliked having to associate with Jewish and other non-German musicians. He disliked the patriotic American speeches given by one William J. Cameron as a regular feature of the Sunday Evening Hour at which Guenther played. On one occasion he became so combative as to express to other musicians that Cameron was a "swine-hound" using the German epithet.

27. Defendant's son Rolf attended the University of Michigan while he was in the United States. During the summer vacations he in-

structed and led the Children's Group of the German-American Bund at the Bund Camp according to the plan followed by the Hitler Youth in Germany. Defendant knew of the activity of his son Rolf in this regard and admitted that some of the children involved may thereby have been indoctrinated with Nazi philosophy.

28. Defendant Guenther apologized to friends for not maintaining a better standard of living in his home and for driving an outmoded automobile, saying that he was saving his money so that he could live like a king when he returned to Germany to make his home there. On one occasion he pointed out the place of the map of Germany where he planned to eventually make his home.

29. Defendant Guenther on one occasion called in a neighbor to visit his home and to show him pictures of Hitler and the German army, saying with pride that this is what they had in Germany.

30. Defendant's son Rolf returned to Germany in 1937 following his graduation in a language course at the University of Michigan. In Germany he became a leader in the Hitler Youth Movement. In 1939 Rolf was wearing a Nazi Party uniform and had some time previously been employed in the office of the Auslands Institut in Stuttgart, Germany, a propaganda agency for Germans abroad, operated by the foreign organization of the Nazi Party. Later Rolf joined the German army and died in the German invasion of Crete.

31. The dog owned by the Guenther family was sent to Germany and when last heard of was serving with the German army in Norway.

32. Defendant's daughter Katherine returned to Germany to live in 1938 refusing an opportunity to work in the American Consulate Office in Germany, but taking up instead a position with the German Foreign Office of the German Government in Berlin.

33. Defendant's wife returned to Germany to live in 1938. In 1939 she took it upon herself to register former members of the German-American Bund who she knew to be in Germany with the Kameradschaft USA so called "alumni association Bund members" then in Germany, through which organization the Nazi Government helped maintain valuable contacts for Germany in the United States.

34. Defendant Guenther as a witness was one whom the Court could not believe on many points. He appeared to be trying to protect what he conceived to be a contention favorable to his side of the issue rather than to tell the truth.

35. Defendant Guenther on two occasions applied for and received Rueckwanderer marks. On each occasion he invested all of his money therein. On each occasion he stated that he intended to return to Germany for a permanent residence. He was thoroughly familiar with the conditions of the issuance of such marks. He had broadcast information about them on the German Radio Hour. He knew that money put into Rueckwanderer marks could not be used except in Germany. He obtained for the purpose of re-immigration of himself and his family to Germany certificates of Acceptability from the German Consulate in Detroit.

36. Defendant Guenther stated on a number of occasions that he intended to return to Germany to reside. In 1938 he wrote to Germany for information about a job which he desired there. When his wife and daughter went to Germany in 1938 farewells were said to family friends, mementos were exchanged and it was announced by the Guenther family that they were burning their bridges behind them; all furniture and household goods were shipped to Germany and a home set up there. Defendant Guenther himself was to live with friends in the United States until he could complete his contract with the Detroit Symphony in March, 1939, and he then also was to go to Germany to live, which he subsequently did. At that time he said "good-bye" to his friends and severed all connections in the United States. He worked in Germany during the summer of 1939. It was only the outbreak of the war, fear of bombing and attendant difficulties in following his profession as a musician in war occupied Germany that forced Guenther to return to the United States in the late fall of 1939.

37. Defendant Guenther was an honored and enthusiastic member of the German-American Bund in Detroit. He joined the German-American Bund or its predecessor organization in 1934 and remained a member therein until he moved to Germany in 1939. In 1939 in Germany he affiliated himself with the Kameradschaft USA, an extension of the German-American Bund in Germany. In 1939 he visited a museum established in Stuttgart, Germany, to propagate the great work of the Bund in America for German National Socialism.

38. During the time that defendant Guenther was a member of the German-American Bund he attended officers' meetings of the organization.

39. Guenther donated his own services as a musician and obtained the services of other musicians for Bund occasions, particularly employing musicians who exemplified the Nazi ideas of German culture and service of the German Volksdom.

40. Guenther was in charge of the musical part of the program for German Day in Detroit in May, 1935, on which occasion the German-American Bund held a regional convention in Detroit. The speeches and other parts of the program on that occasion in which Guenther took part clearly brought out the Nazi and un-American aims of the Bund.

41. Defendant Guenther was a close personal friend of Fritz Kuhn, former Detroit Unit

Leader, and later National Leader of the German-American Bund. Kuhn even visited at Guenther's home and some times engaged in the playing of cards with a small group there. Witness Paisley on occasions saw defendant Guenther and Fritz Kuhn when they came into the Guenther home after attending meetings of the Bund. Kuhn and Guenther on these occasions would count money that they had in a small box.

42. Defendant's wife was active in the Frauenschaft, the Women's Division of the German-American Bund. She entertained the Bund women as a group in her home.

43. Defendant Guenther and his family attended Bund meetings at the Bund Camp and other special celebrations of the Bund. They took an active part in Bund activities and affairs. They were well acquainted with the leaders of the movement in Detroit as well as with several of the National Officers of the Bund.

44. Guenther participated in the ceremonial Bund ritual, including the Nazi salute, the Nazi greeting "Heil" and "Sieg Heil", the display and honoring of the Nazi swastika flag, which is the German national emblem and in the singing of the Horst Wessel and Deutschland uber alles.

45. In addition to the speeches which defendant's son Rolf made in his presence in which Nazi German folk lore was taught, defendant Guenther himself made speeches on various Bund occasions. He admitted that he gave one of these speeches on which occasion he stated that his subject was "See America First".

46. In addition to his Bund activities defendant Guenther was a member of an organization known as the Deutsche-Amerikanische Berufsgemeinschaft, which organization has been shown by the testimony here to have been an extension of the German Labor Front in the United States. Defendant was a member of this organziation for eight months during 1937 and 1938 during which time he regularly paid dues to the organization.

47. The defendant in conversation continuously used the expressions "We Germans" and "You Americans". He compared conditions in the United States and Germany to the discredit of the United States.

48. The Court finds that the defendant Guenther was an ardent believer in and advocate of German National Socialism philosophy for several years in Detroit. There is no reason to believe his views and beliefs were ever essentially different from what they were during that time. He admitted on the stand that he behaved as a Nazi in singing Nazi German songs and in giving the salute to the Nazi flag.

49. The Court finds from a consideration of all the facts that the defendant Guenther was for several years attached to and a supporter of the National Socialistic theories known as the blood theory, the Volk theory, the concept of ein Volk, ein Reich, ein Fuehrer, and the leadership principles—all as advocated by the German-American Bund. The defendant identified himself with the German Volksdom.

50. The Court finds that at the time the defendant made and filed his petition for naturalization he was not attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the United States. He did not have the intention to become a citizen of the United States in good faith and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he was at that time a citizen or subject. He did not have the intention to reside permanently in the United States.

51. At the time of making and filing his petition for naturalization defendant Guenther was attached to the principles of Government exemplified by Germany under Adolf Hitler and by the National Socialistic German Workers Party in Germany.

52. The Court finds that at the time defendant Guenther took his oath of allegiance to the United States on December 30, 1929 defendant did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty and particularly to Germany of which he had theretofore been a citizen and subject; he did not have the will to support and defend the constitution and laws of the United States of America against all enemies, foreign and domestic; he did not have the will to bear true faith and allegiance to the same; he did not take his oath and obligation of citizenship freely without any mental reservation or purpose of evasion.

53. Defendant Guenther on December 30, 1929 at the time of taking his oath of allegiance to the United States had a mental reservation of allegiance to Germany.

54. Defendant Guenther on December 30, 1929 at the time of taking his oath of allegiance to the United States had a mental reservation that he would not support and defend the constitution and laws of the United States against all enemies, foreign and domestic, and that he would not bear true faith and allegiance to the same. He had a secret purpose to evade his full duty and obligation as a citizen of the United States.

## CONCLUSIONS OF LAW

In addition to the conclusions of law heretofore reached and announced in connection with the findings about the Bund in this cause, the Court reaches the following conclusions of law;

1. The defendant at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution

of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. An order should be entered setting aside the original order admitting the defendant to citizenship and cancelling his certificate of citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and crossexamined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud.

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said Herman Guenther to citizenship, upon petition number 44713, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,299,420, heretofore issued to Herman Guenther, be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

## In re SCHREIBER

### FINDINGS OF FACT

1. The defendant herein was born March 29, 1905, in Germany, and prior to September 2, 1932, he was a citizen of Germany. He emigrated to the United States from Germany in February, 1926. On April 26, 1932, he filed petition for citizenship No. 69674 in the United States District Court at Detroit, Michigan, in which he alleged under oath as follows: "I am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of (whom, which) at this time I am a subject (citizen) and it is my intention to reside permanently in the United States."

On September 2, 1932, an order was entered in the United States District Court at Detroit, Michigan, admitting the defendant to citizenship, Certificate of Naturalization No. 3635318 being issued to him by the Clerk. On the same day he took the following oath of allegiance:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of (whom, which) I have heretofore been a subject (citizen); that I will support

and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely, without any mental reservation or purpose of evasion; So help me God. In acknowledgment thereof I have hereunto affixed my signature."

2. The undisputed and practically uncontradicted testimony and evidence presented in the trial shows that the defendant herein was a member of the German-American Bund and its predecessor organization, Friends of New Germany, from 1934 until the spring of 1940. However, the testimony of other Bund members places the defendant's membership from early 1933 until December, 1941. In a statement made to agents of the Federal Bureau of Investigation Schreiber admitted that he had maintained a cabin at the Springfield Social Club which has been proven to be a part of the German-American Bund until December, 1941. In addition Willy Leudtke, a former National Bund officer, testified, without contradiction, to having seen Schreiber at a Bund meeting at the camp in May, 1941, when Leudtke and Kunze visited Detroit on a nationwide tour of Bund units.

3. The testimony is uncontradicted, and the defendant admits that he was a member of the Ordnungs Dienst or Order Service of the Bund from some time in 1934 until the spring of 1940. Similarly, it is undisputed, and the defendant admits that he held the following offices in the Detroit Unit of the Bund: Ordnungs Leader from early 1935 until September or October, 1937, and was active leader of the Detroit Unit from September or October, 1937, until October, 1939. The defendant claimed that he dropped membership in the Bund in the spring of 1940, but this is not supported by any documentary or other evidence besides defendant's own statement on the stand. The records of the applications maintained by the Sheriff of Oakland County for Special Liquor Permits by the German-American Bund show that the defendant herein was listed as Secretary of the Bund during May, 1940.

4. As a member of the Detroit Unit of the Bund defendant attended and took part in two national conventions of the Bund, to-wit, 1938 and 1939, as a delegate from Detroit. In addition, the defendant attended and participated as part of the Detroit delegation in four Regional Conventions of the Bund which were held in Detroit, Cleveland, Milwaukee and Chicago between 1935 and 1939. The defendant admits that on four occasions he proceeded to different cities in Canada as part of a Detroit Bund delegation in connection with German Day celebrations or Bund activities, and, as a matter of fact, identified himself in the photograph taken at a Bund meeting in Windsor, Canada, in which he is wearing the uniform of the Ordnungs Dienst.

5. The evidence discloses, and the defendant admits that as Unit Leader he presided over Bund meetings in Detroit. That he performed the functions of that office and carried out the orders of the national organization to promote, teach and propagate the aims and purposes of the Bund. He admitted that he submerged his own thoughts in carrying out the duties of Unit Leader in accordance with the policies of the National Bund organization and the leadership principle.

6. Defendant admitted, and the other evidence discloses that as an Ordnungs Dienst member, and later as a leader of the Ordnungs Dienst, the defendant was aware that the Ordnungs Dienst was the militant backbone of the Bund movement and participated in the duties of the Ordnungs Dienst in spreading propaganda, soliciting members, and in various other ways, publicized the doctrine of National Socialism, sponsored by the Bund. Witnesses testified that Schreiber brought German newspapers and other propaganda into the plant where he worked and distributed it. When portions of the minutes of the 1938 convention relating to the Ordnungs Dienst were read to the defendant, he readily admitted that he understood that that was the policy of the Bund concerning the Ordnungs Dienst. There is no doubt that the defendant was fully aware of the duties and the purpose of the Ordnungs Dienst.

7. The testimony of witnesses, the admissions of the defendant, and the newspaper exhibits show definitely that as Unit Leader the defendant directed and presided over celebrations held by the Bund commemorating such German national holidays as Reich Founding Day on January 30th commemorating the day on which Hitler came into power, Hitler's birthday on April 20th, the Summer and Winter Solstice, the German Day of Labor on May 1st, and the Nazi Memorial Day for the sixteen National Socialists who died in the Beer Hall Putsch in Munich on November 9, 1923, which was led by Adolf Hitler. The evidence also shows that the defendant participated in similar celebrations before he became the Unit Leader.

8. The evidence discloses that as Unit Leader the defendant made speeches explaining the aims and purposes of the Bund and its relation to Germany and to National Socialism. As Unit Leader, he was in charge of meetings at which he introduced speakers who praised National Socialism and its program and its leader, Adolf Hitler; speakers who advocated the extension of National Socialism in the United States; speakers who advocated the National Socialists' theories of the Volk and the Blood which aimed to unite all Germans throughout the world under one leader; and speakers who advocated a general anti-Semitic program in the United States similar to the program in Germany.

430

9. The testimony of witnesses disclosed, and the defendant admits that as a member of the Bund he believed in and practiced the leadership principle, and as Unit Leader he conducted the affairs of the Detroit Unit in accordance with the leadership principle, which principle as applied to government is diametrically opposed to our democratic way of life.

10. The defendant admits, and the testimony of other Bund members discloses that the defendant as a member of the Bund and as its Unit Leader, participated in the singing of the Horst Wessel Song and the Deutschland Lied, the two national anthems of Germany, and as part of the Bund ritual, gave the Nazi salute with the outstretched right hand, together with the oral salutation "Sieg" or "Sieg Heil".

11. The defendant admitted, and the testimony of other witnesses and documentary evidence show that the defendant as Unit Leader directed and participated in the collection of money for German Winter Relief; that as a member he participated in the 1936 Golden Book by contributing money to a fund which was personally delivered to Adolf Hitler by the Bund Leader Fritz Kuhn; that as a member and leader he participated in the collection of scrap metals to be sent to Germany to assist Germany in successfully accomplishing its Four Year Economic Plan. Defendant admitted that he received official publications of the Bund such as its newspaper, the Weckruf, and the Yearbook.

12. The court finds that the defendant was fully aware of the aims and purposes of the Bund, its connection with Nazi Germany, its belief in National Socialism, and its efforts to extend National Socialism in the United States, and that the defendant herein was entirely sympathetic and believed in the program of the Bund. It is clear to this court that the defendant by his seven years membership in the German-American Bund and its predecessor organization demonstrated completely acceptance and belief in the purposes and aims of the Bund. Defendant claimed that some of the aims and purposes of the Bund were first learned by him during the instant trial, but the court can lend no credence to that statement in view of the overwhelming evidence introduced at this trial showing the activity of this defendant, particularly his own admission that he had attended almost all meetings of the Bund from the middle of 1935 until the spring of 1940.

13. The defendant Schreiber, being an individual who believed in, advocated and propagated the aims and purposes of the Bund, cannot be said by this court to be a person attached to the principles of the Constitution of the United States or well disposed to the good order and happiness of the United States.

14. By subscribing to the Volk and Blood theories and the theory of "Ein Fuhrer (one leader)," the defendant clearly and unquivocally demonstrated that his full and true allegiance was not to the United States and its Constitution, but to a country, leader, system and government other than our own, whose principles were diametrically opposed to the principles of our government.

This is even borne out by the defendant's own admissions that a person born in Germany remains a German national always, no matter what citizenship he carries (pp. 3382–85); by his testimony that he could see nothing wrong in Americans' saluting the swastika flag as it is saluted in Germany (p. 3381); by his testimony that he believed in the way Hitler was doing things before the war started and that between 1933 and 1939 he believed that a dictatorship was the best form of government (pp. 3386–87). In 1939 when the Department of Justice was conducting an investigation into the German-American Bund, the defendant, as Unit Leader, refused to cooperate with the government by refusing to furnish the department with a list of Bund members. If the activities of the Bund were not questionable, there was no reason on the part of its members to fear disclosure.

15. The various witnesses testified to statements made by Schreiber and to his conduct and activities:

(a) EDWARD BOYKE testified that Schreiber stated the Bund was opposed to the "Jewish Movement".

(b) JOHN FESSLER testified that defendant told him at the time the German zeppelin burned in the United States that the United States government and the Jews were responsible for the burning of the German zeppelin by refusing to sell helium to Germany. Fessler testified that the defendant told him that there were too many Jews in the United States government. Fessler further testified that the defendant told him that Hitler was the coming man for Germany and that, "We will be glad to have one here some day." Defendant further told Fessler that Hitler's policies were right; that the rest of the world had no right to deny Germany what she wanted, and if Germany could not get it, she would have to take it.

(c) JOHN FERKO testified that at the time of the Poland invasion defendant stated that Germany was justified in anything it did in the war and predicted that Germany would invade the low countries, which, as a matter of fact, did take place. Ferko testified that the defendant told him that the German army was superior to that of all other countries. Ferko testified that the defendant spread pro-German and anti-Semitic literature at the Fisher Body Plant during working hours and took care of Bund matters at the same time with company materials and on company time. Ferko testified that defendant stated that Hitler was justified in invading Austria because Germany and the German people were entitled to what belonged to them and that people in

those countries being of German origin would be better under the German government. Schreiber told Ferko that Germany would be the place to live if he had his choice.

(d) Two witnesses, WALTER SKOWN and ESTER ROGERS, testified that the swastika and Adolf Hitler's photograph were prominently displayed in the Schreiber home. Skown, who was a close friend of Schreiber's, testified that the swastika and photograph of Hitler were in Schreiber's various homes from 1934 until at least 1940. ESTER ROGERS testified that she saw mail in the common mail box used by her family and the Schreibers from German war prison camps in Canada. Another witness testified that Schreiber wore a swastika in his buttonhole, and Schreiber admitted this, but claimed that it was the Bund insignia. However, he did admit that the Bund insignia was the swastika. Another witness testified that in 1939 at the Fisher Body Plant that the defendant and others were listening to a radio speech by Adolf Hitler, and that at the conclusion of the speech Schreiber stated, "Isn't he great? He has the right idea."

(e) The witness SKOWN testified that on occasions of his visits to the Schreiber home he saw various Bund officials there. He testified that over many years in discussions held at the Schreiber home and at the Fisher Body Plant Schreiber always favored and took the side of National Socialism as against Democracy. The defendant in Skown's presence stated that the President's name was really Rosenfelt and traced him back to Jewish ancestry. This piece of propaganda is often publicized by the Nazi Government.

(f) Evidence was introduced that the defendant did not intend to reside in the United States permanently. At the trial it was shown that he sold his house and furniture preparatory to returning to Germany, but was prevented from accomplishing his desire by the outbreak of war. The witness Skown testified that Schreiber told him in 1940 that Schreiber had intended to return to Germany in 1939 and take a job in the Volks Wagen Works, but the outbreak of war had resulted in the suspension of the sailing to Germany which he had intended to make. Another witness testified that Mrs. Schreiber told her that they intended to return to Germany, but that the State Department refused to issue a passport after war had begun in Europe.

16. The defendant categorically denied some of the evidence introduced by the government. The defendant offered a few character witnesses on his own behalf who merely testified to his ability as a worker. However, on cross-examination, it developed that none of those witnesses was aware that Schreiber was a member of the Bund; their only qualification was that they were acquainted with Schreiber's work at his place of employment. There is nothing in the record that Schreiber ever said anything for the United States government or praised the United States government. It is true that his witness stated that they never heard him say anything against the government, but by the same token, it is possible to find ten thousand people who would not have heard a particular individual say anything against the government.

17. The court reaches an inescapable conclusion that the defendant's activities subsequent to his naturalization clearly and unequivocally show that he was not attached to the principles of our Constitution; he was not well disposed to the good order and happiness of the United States; that he never intended to become a citizen of the United States, but intended to retain his allegiance to Germany; that he did not intend to support and defend the United States against all enemies, foreign and domestic; and that he took the oath of allegiance with a mental reservation.

The law is clear that evidence of un-American and pro-German activities on the part of the defendant subsequent to his naturalization are admissible and are material and relevant to prove the defendant's state of mind at the time he filed his petition and took the oath of allegiance.

## CONCLUSIONS OF LAW

The court, therefore, makes the following conclusions of law in addition to the conclusions of law heretofore reached in connection with the German-American Bund issue:

1. The defendant, at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen, and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. An order should be entered setting aside the original order admitting the defendant to citizenship and cancelling his Certificate of Citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and crossexamined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud,

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said John Henry Berthold Schreiber to citizenship, upon petition number 69674, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,635,318, heretofore issued to John Henry Berthold Schreiber, be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

## In re GIES

### FINDINGS OF FACT

The Court finds the following facts with respect to the defendant, Paul Gies:

1. The defendant, Paul Gies, was born in Germany, and came to the United States in November, 1923. Prior to June 24, 1929, Gies was a citizen of Germany. On March 14, 1929, defendant filed petition for citizenship #40490 in the United States District Court, Detroit, in which he alleged under oath as follows:

"I am attached to the principles of the Constitution of the United States, and it is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the German Reich of whom at this time I am a subject, and it is my intention to reside permanently in the United States."

On June 24, 1929, an order was entered in this Court admitting the defendant to citizenship, and the Clerk of the Court issued Certificate #3022234. On the same day, Gies took the following oath of allegiance:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the German Reich of whom I have heretofore been a subject; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; and that I will bear true faith and allegiance to the same."

2. The defendant was a lieutenant in the German army during the first World War.

3. In his statement to Federal Bureau of Investigation agents in 1942, he stated that one of the principal reasons for his coming to the United States was to get the property which the Alien Property Custodian had taken from his father-in-law who was residing in the United States during the first World War. He further stated that his desire to return to Germany as early as 1933 was prevented by the suits he had pending in this country.

The Court finds that defendant Gies came to the United States for a temporary purpose and did not at the time of making and filing his petition for naturalization, intend to reside permanently in the United States.

4. Defendant Paul Gies was a member of the Detroit Unit of the National Socialist

German Workers Party and its successor organization, The Friends of New Germany, from sometime in the early part of 1932 until February, 1934. He attended meetings of this organization at its meeting places at the Hitler Heim on Chelsea Street, Detroit, and Concordia Hall, Detroit.

5. Defendant Gies was the leader of the Detroit Unit of the Friends of New Germany from the latter part of 1933 until February, 1934, at which time he was put out of the organization as a result of his unsuccessful contest for leadership. As leader he operated the organization under the leadership principle.

6. Even after Gies ceased to be an active member of the Friends of New Germany, he attended functions of the organization held at its camp, known as "Camp Eichenfeld", near Pontiac, Michigan.

7. While a member of the organization, Gies was present during meetings at which the regular paraphernalia, such as swastika flags, pictures of Adolf Hitler, and pins of the Nazi party were displayed; he also took part in the regular rituals of the organization, such as the singing of Nazi songs and the giving of the customary Nazi salute.

8. Defendant Gies, while a member of the Friends of New Germany, engaged in discussions favorable to National Socialism and its policies at meetings, and also delivered speeches explaining and approving of National Socialism and the policies of the Hitler government in Germany.

9. Defendant Gies has been thoroughly familiar with the nature of the organization known as the Friends of New Germany, its connections with National Socialist organizations in Germany, and its aims and purposes, such as furthering the policies of the Nazi government in Europe, and the fostering of the principles of National Socialism in the United States. He subscribed to those purposes and aims.

10. Gies, as a lawyer trained in Germany, furnished legal advice to the Friends of New Germany, and handled various legal matters for the NSDAP in United States.

11. As leader of the Friends of New Germany, Gies was instrumental in the organization of a Woman's Auxiliary of the Friends of New Germany.

12. Gies was one of the co-founders of "The Stahlhelm" in Detroit in 1928, a German nationalistic war veteran's organization.

13. Defendant Gies wrote and had in his possession numerous poems, written speeches, and other documents of pro-Nazi content, and containing material derogatory of the President of the United States and other government officials. Typical of such material is Exhibit MS256, a poem composed by Gies and reading as follows:

## TRANSLATION

## SONG OF THE GERMAN-AMERICANS IN 1940

Here they call us "fifth columnists"
With lies they besmirch German honor.
Oh, how they would revel
If England were to be victorious and there were no more Germany.
When the war is over
We shall go back home
Then we shall be happy
In our free Fatherland.
Then we shall celebrate in the shade of German forests
With beer and wine and German song
And thank God that he guided wisely,
That he decided the struggle in favor of the German right.
When the war is over
We shall all go back home.
We shall be happy
In our free German land.
This country is no longer the land of "freedom"
Only Jews have "freedom and justice" here.
We "German" are only allowed to pay taxes
But we must keep our mouths shut; otherwise we will get into trouble.
Therefore when the war is over
We shall all go back home.
We shall be happy
In our free German land.
We want no thanks for what our forefathers did for this country with their blood and work.
In "Seventeen" we were beaten;
Today we are called "The fifth column".
In our free German house
There'll be no F.B.I.
God Bless America,
America Good Bye.
Over there the Jews drove us out of our country.
So we came here to get some peace at last.
Today it is this same "Kosher rabble" here
Who constantly follow us with lies and deceit.
They were thrown out of Germany
That's why it's now so nice at home
AWAKEN AMERICA
Some day you, too, will throw them out.

Also typical is PG120, a song by Gies, in which he says, "In happiness we return to Germany and let the world go by, Forget that land with the F.B.I."

14. Defendant Gies thoroughly approves of the policies of the Nazi government in Germany, such as anti-Semitism, racial inequality and the superiority of the German race; he did not approve of the nature and policies of the United States government; he had no desire to see Germany suffer a military defeat at the hands of United States and her allies; and is unwilling to take up arms against Germany as the enemy of United States.

434

15. The foregoing being true, it is found as a fact that, at the time of his naturalization and at all times since, defendant Gies has had no real attachment to the United States and the principles of its Government, but has retained his allegiance, attachment and sympathy for Germany.

16. From 1929–1935, Defendant Gies had the intention to return to Germany to live, but did not do so for financial reasons.

17. Defendant Gies strongly desired to return to Germany in 1939, and made an effort to do so, but was prevented from returning by the imminence of war and later by the outbreak of war.

18. At the time of his naturalization and at all times since, Gies has had no intention of residing permanently in the United States.

19. October 29, 1942, defendant Gies stated to agents of the Federal Bureau of Investigation that after Germany was engaged in the war from September, 1939, to December 1941, he wanted to see Germany win; he thought England ruled the world and that Germany was justified in trying to remove England by warfare. Since Germany declared war on the United States, defendant thought Germany ought not to be defeated, but that there should be a negotiated peace. He held that Germany and Hitler desire peace, but that their desires and offer of peace were refused by Churchill and Roosevelt.

20. In about June, 1942, defendant Gies stated to John Daniel Clemmons, a negro citizen of Detroit, at a time race feeling was keen because of riots, that the colored people should join with the Japs. He also said that the colored people did not have a good chance in the United States. He said there are one million more Germans in the United States than English, and that the Germans would run the English out of the United States.

21. On October 29, 1943, outside the courtroom after a session of this trial, defendant stated to two young ladies that the English have organizations in the United States, and he could not understand why the Germans were objected to. He also said, "Well, you are just fighting for the British, anyway."

22. The Court finds that defendant at the time of his naturalization was not well disposed to the good order and happiness of the United States, and at all times since has continued to be of the same reprehensible disposition.

23. The Court finds that defendant has at all times since he has been in the United States been attached to German National Socialistic ideas and principles, which are incompatible with attachment to the principles of the Constitution of the United States.

CONCLUSIONS OF LAW

In addition to the conclusions of law heretofore reached and announced in connection with the findings about the Bund in this cause, the Court reaches the following conclusions of law:

1. The defendant at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. An order should be entered setting aside the original order admitting the defendant to citizenship and cancelling his certificate of citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and crossexamined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud,

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said Paul Gies to citizenship, upon petition number 40490, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,022,234, heretofore issued to Paul Gies, be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

### In re STREUER

### FINDINGS OF FACT

1. Defendant herein was born in Germany on May 27, 1896, and came to the United States in May, 1923. He was married to a native and citizen of Germany who has not applied for United States citizenship. Prior to June 8, 1931, the defendant was a citizen of Germany. On March 4, 1931, he filed petition for citizenship No. 58179 in the United States District Court in Detroit, Michigan, in which petition he alleged under oath as follows:

"I am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to The German Reich, of (whom, which) at this time I am a subject (citizen) and it is my intention to reside permanently in the United States."

On June 8, 1931, the court entered an order admitting the defendant to citizenship, and the Clerk issued to him Certificate No. 3445143. On the same day he took the following oath of allegiance:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of (whom, which) I have heretofore been a subject (citizen); that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely, without any mental reservation or purpose of evasion: So help me God. In acknowledgment thereof I have hereunto affixed my signature."

2. Defendant served in the German army during the first World War from 1914 until 1919 and reached the rank equivalent to Top Sergeant. Since his arrival in the United States he has been continuously employed at the Solvay Process Company in Detroit. He has one child.

3. Defendant admits, and the other evidence and testimony conclusively show that the defendant was a member of the Detroit Unit of the German-American Bund and its predecessor organization, The Friends of New Germany, from April, 1933, until at least and possibly after October, 1941. During his period of membership he was a member of the Ordnungs Dienst or Order Service, the militant backbone of the Bund; at various times he held the offices of Secretary and Treasurer, Organization Leader, and from October, 1939, until October, 1941, he was Unit Leader and recognized as such by the National Headquarters.

4. The testimony of Streuer, the other defendants and other witnesses show conclusively that the defendant was one of the most active members; he attended most of the meetings, and was among the few who regularly attended closed officers' meetings at which times the policies and program of the Bund were outlined and discussed.

5. The testimony of Hans Mathias, which is undisputed, shows that the defendant between 1931 and 1933 attended meetings of the National Socialist German Workers Party, Detroit Unit, which were held at the home of Heinz Spanknoebel in Detroit. This house was known to its members as the Hitlerheim. The evidence shows that at these meetings the twenty-five points of National Socialism and other official Nazi publications and propaganda were available and were discussed and explained favorably. Streuer admitted knowing that some of the members from this Nazi Party Unit were also members of the Nazi Party in Germany.

6. The court concludes that when Streuer became a member of the Friends of New Germany in April, 1933, he knew that it was

the successor to the N.S.D.A.P. (Nazi Party) Unit in Detroit, and that its aims and purposes were the same, that is to spread and disseminate the program and philosophy of National Socialism and Adolf Hitler and to extend it in the United States. With this full and complete knowledge the defendant continued as one of the most active members and officers of the Bund for over eight years.

7. Streuer admitted that he attended the National Conventions of the Bund in 1940 and 1941 belying his own statement that the Bund ceased activity in Detroit during 1940. Streuer was President of the Springfield Social Club during 1940 and 1941 which has been established to be the camp organization of the German-American Bund in Detroit and so recognized by the National Leaders. Streuer also admitted attending the Regional Convention of the German-American Bund held in Chicago in 1938.

8. Defendant admitted attending the Regional Convention of the Bund held in Detroit on May 15, 1935, which was attended by the National Leaders who spoke. A program of this occasion was found in Streuer's home in 1942. From this program, it is clear to this court that one who attended this convention was fully informed of the aims and purposes of the Bund with regard to the approval and dissemination of National Socialists' philosophy and the glorification of its leader, Adolf Hitler.

9. Defendant admitted that as Treasurer of the Bund in its early days, many applications for membership passed through his hands, and that he might have filled one out himself. In this connection, the defendant testified that on July 22, 1942, he made a statement in the office of the United States Attorney at New York wherein he admitted that when he made his application for membership in the F.D.N.D. he knew that, "It said something that had to be of Aryan blood and recognize the Fuhrer (leadership) principle of the organization."

10. Streuer was a member of the Stahlhelm in Detroit during 1934, 1935 and 1936. This was a Nationalistic organization of German war veterans with headquarters in Germany. When the Bund organized a Front Fighters Group in 1936 composed of German War veterans, Streuer resigned from the Stahlhelm. The Front Fighters Group with the Bund wore the same uniform as the Ordnungs Dienst.

11. Streuer testified that during his tenure of office in the Bund he received and knew the official forms furnished him by the National Headquarters. He admitted that as Unit Leader he received instructions from National Headquarters. In a statement made to agents of the F.B.I. on June 9, 1942, defendant admitted receiving various Bund Commands from the National Headquarters.

12. The testimony of Streuer and others shows that the Detroit Unit participated in and celebrated German National holidays and that Streuer attended these celebrations. There was found in Streuer's possession a portion of a speech which he states was given at a Solstice in Detroit. The portion which was read to the court clearly shows that the members who participated in this celebration looked to Adolf Hitler as their leader.

13. Streuer admitted that while he was a member of the Bund the swastika flag was used and the German National Anthem sung and the German oral salute "Sieg Heil" was given.

14. Streuer admitted that the Bund while he was a member operated under the leadership principle.

15. Streuer admitted that in 1940 and 1941 he contributed money to the National organization of the Bund for the purpose of paying its debts and stated that he felt honor bound to do so. In this connection, although the defendant denies that there was any Bund organization in Detroit after 1941, he admitted in a statement made to agents of the F.B.I. on June 9, 1942, and the testimony of the witness Neumann on this trial disclosed that in the early part of 1942 there was a meeting of Bund members in Detroit at the Fort Shelby Hotel which was attended by Wilbur Keegan, the National Bund attorney.

16. Defendant admitted his knowledge of the German blood theory, according to which he always remained a member of the German racial family no matter where he lived.

17. The court concludes on the history of Streuer's membership in the Bund, his activities and his background that he was fully aware of and approved and helped disseminate the aims and purposes of the Bund which were to extend National Socialism in the United States and glorify its leader, Adolf Hitler. His more than eight years membership convinces this court that he believed in and approved of the Bund program. Belief in Bund principles is absolutely inconsistent with American citizenship. The oath of allegiance has no meaning to one who espouses the National Socialists' cause. By his conduct he has shown himself to be not attached to the principles of the Constitution of the United States. His activities in the Bund show that he had a mental reservation of allegiance to Germany at the time he took his oath of allegiance.

18. Various witnesses testified to statements made by Streuer in his place of employment.

(a) Robert E. Mara testified that Streuer stated that Hitler did good for the German people.

(b) The witness James F. Fearn testified that between September, 1939, and December, 1941, in conversations at the plant, Streuer upheld Germany, and on one occasion stated, "I am a German." Witness stated that war

news favorable to Germany made the defendant feel good.

(c) The witness Fred Blair testified that Streuer registered approval of Hitler's policy in driving the Jews out of Germany.

(d) The witness Richard E. Moore testified that Streuer posted on the bulletin board at the plant headlines from newspapers with blue pencil marks to show German advances in the war. According to this witness, Streuer blamed the war on the British.

(e) Witness Peter Mizgala testified that Streuer stated that Germany was far more advanced than the United States. Streuer said the witness stated that Streuer spoke in favor of the Nazi program and that Streuer stated that Hitler was right in chasing the Jews out and getting rid of them. Streuer placed the responsibility on England for the present war. According to the witness, Streuer stated that the Jews in the United States controlled the country. Witness testified that in 1937 or 1938 during conversations Streuer stated to the witness that he, Streuer, was not a Nazi but pro-Nazi.

(f) The witness Alexander Papp testified that after 1933 Streuer stated that people in Germany had better working and living conditions than people in the United States. During the same period Streuer approved of Hitler's policy and glorified the Nazi ideology. The witness testified that Streuer's attitude during that period was that the Germans were superior to all other Europeans, and at one time stated to the witness, "You are just a Hunk. Don't talk to me, I am a German." In 1934 in a conversation with the witness Streuer stated that although he had his citizenship papers, in due time he was going back to Germany anyway. Shortly after Hitler came into power Streuer told the witness that the Germans had more culture than any other people in Europe, and they should be the leaders and dominate.

(g) The witness Herbert McGregor testified that in 1940 when Germany was invading France, Streuer expressed the belief that Germany would win the war, and after France failed, Streuer stated that the Germans would be in England in two weeks time. The witness testified that when the war news was favorable to Germany, Streuer was pleased. Streuer placed the blame for starting the war on Great Britain.

(h) The witness Ludwig Migearo testified that in conversations had with Streuer, Streuer considered the German people better than all people. He testified that Streuer stated that everything in Germany was better than in the United States.

19. The court observes that none of the testimony of Streuer's fellow-employees was disputed or rebutted. The defendant offered no witnesses on his own behalf to show any activities or statements in which he favored the United States government or its principles.

His German activities started almost at the same time as his admission to United States citizenship, and has continued down almost to the present.

## CONCLUSIONS OF LAW

The court, therefore, makes the following conclusions of law in addition to the conclusions of law heretofore reached in connection with the German-American Bund issue:

1. The defendant, at the time of making and filing his petition for naturalization, was not attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. It was not his intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich, of which he at that time was a citizen, and it was not his intention to reside permanently in the United States.

2. The oath of allegiance which the defendant took at the time of the order admitting him to citizenship was false and fraudulent in that he did not absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany, of which he had theretofore been a citizen; it was further false and fraudulent in that he did not in good faith have the will to support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, and he did not have the will to bear true faith and allegiance to the same; and he did not take this obligation freely, without any mental reservation or purpose of evasion.

3. The defendant at the time of taking his oath of allegiance had a mental reservation of allegiance to Germany.

4. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not well disposed to the good order and happiness of the United States.

5. The defendant at the time of taking his oath of allegiance had a mental reservation that he was not attached to the principles of the Constitution of the United States.

6. The defendant at the time of taking his oath of allegiance had a mental reservation that he did not intend to reside permanently in the United States, but would in the future return to Germany to live.

7. The defendant at the time of taking his oath of allegiance had a mental reservation that he would not support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, but would reserve to himself the right to determine who or what he would treat as an enemy of the same.

8. The order admitting defendant to citizenship was procured by fraud.

9. An order should be entered setting aside the original order admitting the defendant to citizenship and cancelling his Certificate of Citizenship.

## ORDER CANCELLING CITIZENSHIP

At a session of said Court held in the Federal Building in Detroit, Michigan, on March 10, 1944.

Present: Honorable Edward J. Moinet, District Judge.

The above entitled cause having come on for trial, pursuant to notice, and both parties having appeared, given evidence and cross-examined witnesses, and the plaintiff having submitted proof in support of the allegations in its complaint to revoke the naturalization of defendant, from which it appears to the Court, after carefully considering all of the evidence and arguments of both parties, that the allegations in said complaint to revoke naturalization are true, and that the defendant procured naturalization by fraud,

NOW, THEREFORE, IT IS ORDERED that the order heretofore entered admitting the said Fritz Streuer to citizenship, upon petition number 58179, be and the same is hereby revoked and set aside.

IT IS FURTHER ORDERED that Certificate of Naturalization Number 3,445,143, heretofore issued to Fritz Streuer, be and the same is hereby cancelled on the ground of fraud, and the same shall be delivered and surrendered to the Clerk of the United States District Court for the Eastern District of Michigan, and transmitted by him to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.

IT IS FURTHER ORDERED that the Clerk of the United States District Court for the Eastern District of Michigan forthwith transmit a certified copy of this order to the Commissioner of Immigration and Naturalization, Philadelphia, Pennsylvania.